E-FILED
Monday, 30 November, 2020  11:13:59 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JEFFREY DEAN MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cv-3238 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>REPORT AND RECOMMENDATION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Jeffrey Dean Miller appeals from the denial of his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. 42 U.S.C. §§ 416(i), 1381a and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Miller filed a Motion for Summary Reversal (d/e 11). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 17). This matter is before this Court for a Report and Recommendation. For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be REVERSED and REMANDED.

## STATEMENT OF FACTS

### Background

Miller was born on August 25, 1966. He secured a GED and formerly worked as a carpet cleaner and flooring installer. He last worked in 2011. He filed his application for SSI on September 22, 2016.[1] Miller suffered from degenerative arthritis of the spine, degenerative joint disease of the right shoulder, osteoarthritis of the right ankle, affective disorder, anxiety and panic disorder, personality disorder, posttraumatic stress disorder (PTSD), and alcohol abuse. Certified Transcript of Proceedings before the Social Security Administration (d/e 7) (R.), 25, 27, 35,48, 50-52,1041.

### Evidence Prior to the Evidentiary Hearing

On August 27, 2012, Miller had an MRI of his right shoulder. The MRI showed AC joint arthritis with inflammation with bone marrow edema of the clavicular and acromion tips. The MRI showed no full thickness rotator cuff tear, minimal partial tears of the supraspinatus and infraspinatus and tears involving the labrum. R. 461.

On December 24, 2012, Miller had an MRI of his lumbar spine. The MRI showed mild diffuse degenerative changes with moderately severe

---

[1] Miller filed a prior application for Disability Insurance Benefits and SSI in 2012. The application was denied. R. 66. The transcript of a September 24, 2014, evidentiary hearing on the prior application is in the record. R. 128-172.

canal stenosis at L4-L5 and mild to moderate canal stenosis at L5-S1.  R.
460.

On January 20, 2015, Miller saw podiatrist Dr. John Shoudel, DPM,
complaining of pain in his right ankle and foot.  Miller said that several
years earlier he jumped over a fence, landed on his heel, and suffered a
calcaneal fracture.  He did not seek medical treatment at the time of the
fracture and reported that he now had trouble walking and bearing weight
on his right heel.  Wearing a boot helped and rest alleviated the pain.  He
spent most of his time lying down.  Miller refused a surgical consult.  On
examination, he had pain on palpation of the subtalar joint and ankle joint,
normal muscle strength, and decreased range of motion.  Dr. Shoudel
assessed a calcaneal fracture with late effect osteoarthritis of the subtalar
joint.  Miller refused to have a CT scan performed and refused a surgical
consult.  Dr. Shoudel also recommended an ankle-foot orthosis
consultation.  Miller was not sure he would go because it involved going
into another building.  Dr. Shoudel wrote an order for the orthosis
consultation and gave it to Miller and left it up to Miller whether he would
make an appointment.  R. 474.

On May 27, 2015, Miller saw Dr. Shoudel.  He went for the orthosis
consultation but could not tolerate fabrication of the orthosis.  He was given

an over-the-counter splint, but that did not work.  He refused a surgical

consultation and refused any pain medication.  Miller had the CT scan at

this appointment which showed a healed calcaneal fracture with arthritis of

the subtalar joint and possible fragment as well.  On examination, Miller

had pain on palpation of the subtalar joint, normal strength, and decreased

range of motion.  Dr. Shoudel said that he had nothing to offer Miller since

he refused a surgical consult and he refused any medication.  R. 467-68.

On August 11, 2015, licensed clinical social worker Meghan Golden,

LCSW, wrote a letter addressed to the Social Security Administration.  R.

710.  Golden had been treating Miller since January 2015 and diagnosed

Miller with panic disorder and agoraphobia.  During treatment sessions,

Golden observed Miller's agitation and anxiety. He frequently checked his

own pulse, took deep breaths, and appeared "tense/rigid."  Miller reported

palpitations, shortness of breath, and dizziness. Golden opined that Miller's

symptoms were severe and affected his daily activities.  He avoided going

out during the day or going to social events.  He shopped for groceries at

4:00 a.m. to avoid being around other people.  Golden stated that Miller's

obsessive thoughts prevented him from focusing and concentrating on

tasks.  He believed other people were plotting against him.  Golden stated,

"Mr. Miller's paranoid and possibly delusional beliefs have resulted in his

refusal to take any prescription medications, as he fears that he will have negative reactions and possibly become violent, or become addicted to the medication." R. 710.

On October 6, 2015, Miller saw Dr. Jatin Patel, M.D. Miller complained of right foot pain and reported a gradual onset of intermittent episodes of severe pain in his right foot and ankle. His symptoms were worse with walking and standing and were better with rest. He also reported that his anxiety was worsening. He did not leave the house except to get groceries and he felt as if he was losing control. He felt like he was floating out of his body. Miller asked for medication for his anxiety and foot pain. R. 499.

On examination, Miller had normal gait and station, normal strength and tone, normal range of motion, and stable joints. He had tenderness malleolus and no plantar tenderness. He was oriented, his mood and affect were anxious and in pain, his speech was pressured, and his thoughts were racing. Miller denied any hallucinations, delusions, homicidal ideations or intentions, or suicidal ideations or intentions. His recent and remote memory were intact. R. 500. Dr. Patel recommended ibuprofen for the ankle pain because Miller had not tried any pain medication and did not want medication that had any potential for addiction.

Dr. Patel also ordered an x-ray of Miller's right ankle.  Miller had requested Ativan for his anxiety.  When Dr. Patel told Miller that Ativan had a risk of addiction, Miller decided he did not want any medication for his anxiety.  R. 499.  The x-ray on October 14, 2015, showed a healed calcaneal fracture. Flattening of the calcaneal was noted and was unchanged.  R. 498.

On October 20, 2015, Miller saw Golden for counseling.  He complained of increased irritability and anxiety and reported decreased mood and activity level.  He avoided people and he had nightmares about taking medication.  On examination, Miller's mood was anxious and angry; he affect was full; his speech was normal; his psychomotor was normal; his speech was regular rate and rhythm; his thought processes were linear; his insight and judgment were good; his recent and remote memory were intact; and his concentration was normal.  R. 497.

On April 2, 2016, Miller went to an urgent care facility with complaints of chest pain.  He reported palpitations, anxiety, dizziness, fatigue, and nausea.  R. 742.  Miller's EKG and lab tests were normal.  He was assessed with anxiety and chest pain.  R. 744.  He refused any medications and was instructed to follow up with a psychiatrist.  R. 745.

On April 18, 2016, Miller saw Dr. Patel.  He reported having problems with anxiety.  He had multiple episodes when he thought he was having a

heart attack and he also had left shoulder pain and low back pain.  Miller
had been taking aspirin for his pain, but the pills gave him an upset
stomach.  R. 488. On examination, Miller's bones, joints, and muscles were
normal on inspection and palpation; his range of motion was normal; and
his joints were stable.  R. 489.  Miller's mood was agitated and anxious.  R.
489.  Dr. Patel assessed anxiety, depression, and left shoulder pain, and
noted reduced range of motion in left shoulder in his assessment.  Miller
reluctantly agreed to start venlafaxine for his anxiety.  Dr. Patel scheduled
an x-ray of Miller's left shoulder.  R. 488.

On May 12, 2016, Miller saw licensed clinical social worker Linda
Snyder, LCSW, for counseling.  Miller reported anger and irritability and
said he could not stand being around people.  R. 486.  Miller did not stay in
Snyder's waiting room while waiting to see her.  He waited in the hall
because he could not stand to be around the other people in the waiting
room.  He told her he went to the emergency room 37 times in one year
because he was having an anxiety attach that he believed was a heart
attack.  Snyder noted that Miler drank alcohol to deal with his anxiety
symptoms.  R. 487. Snyder assessed anxiety and depression.  R. 486.

On June 22, 2016, Miller saw Dr. Shoudel.  He reported swelling and
pain in his foot and tingling in his toes.  On examination, Miller had minimal

edema around the rear of his foot and had good clinical alignment.  He had pain on palpation of the subtalar joint and tarsal tunnel region, and pain on range of motion of the subtalar joint.  Sensation was intact.  Miller had normal muscle strength and normal overall range of motion.  Capillary fill time was less than two seconds to the toes.  Miller felt relieved after the visit.  He refused treatment options, including surgery and medication.   R. 466.

On October 6, 2016, Miller saw Dr. Patel.  R. 480-81.  He felt "down, depressed, and hopeless for over a month."  R. 480.  On examination, Miller had normal gait and station, normal range of motion, and stable joints.  His mood was anxious and agitated.  R. 481.  Dr. Patel assessed anxiety, right ankle pain, and depression.  Miller refused any medication. Dr. Patel told Miller to follow up with his mental health counselor.  R. 480.

On October 21, 2016, Miller completed a Function Report – Adult form. R. 327-34.  He lived alone in a mobile home and during the day, he spent most of the day in bed.  He only got up to eat, feed the cat, and check his emails.  Lying flat on his back was the only time he was not in pain; however, sometimes his back hurt from lying in bed too much.  He could take care of his personal care.  His back hurt sometimes when he bent over to tie his shoes.  R. 328.  He did not need reminders to take care of his personal needs

and prepared simple meals such as sandwiches or TV dinners. He vacuumed and did laundry once a week. His mother encouraged him to do his housework and he raked his yard to comply with his mobile home court rules. He raked the yard in 15-minute shifts. He drove and went places alone. He went shopping twice a month early when no one else was shopping. R. 329-30. Miller could pay his bills and handle his accounts. His hobbies were watching television, sports, and trying to exercise. He did these once a week. He visited a friend once a month for three hours and avoided all activities in public. He got into fights if he went out in public. R. 331-32.

Miller said that his impairments affected his ability to lift, squat, bed, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and get along with others. He could walk one-eighth of a mile with a cane "if foot lasts" and had to rest five minutes before resuming "if foot still works. Feels broken, no weight on it." Miller could pay attention until he got bored. He could follow instructions unless the person giving the instructions was disrespectful. R. 332. He got along with others if they were respectful. He was fired once because he "was disrespected, cussed them out on phone." Miller experienced anxiety when under stress and he could not handle changes in routine. He was afraid of dying and taking medication, "Pills

terrify me." He used a cane and a brace to walk "a distance." R. 333. He could go anywhere due to his anxiety. He could not stay on a computer for more than an hour because of his back pain and because his arm falls asleep. R. 334.

On October 25, 2017, Miller saw licensed clinical professional counselor Michael Goldberg, LCPC, for an initial counseling session. Miller's presentation varied during the session. He was agitated and angry talking about situations that troubled him. He was calmer when he talked about helping people. Miller was paranoid about medical providers and recommended treatments. He monitored his pulse frequently and watched the door and window in the office. Goldberg stated that Miller developed skills for dealing with his anxiety such as avoiding social situations and using his mother and his other limited social supports as needed. Goldberg developed some rapport with Miller during the session and assessed anxiety and scheduled another appointment. R. 521.

On November 2, 2016, Miller went to an urgent care facility with low back pain. He said he strained his back bending over to pick up some socks. Dr. Gerard Bitar, M.D., at the urgent care facility noted that Miller was well known there for anxiety and panic attacks as well as being resistant to treatment and afraid to take medication. On examination, Miller

was anxious and in pain.  He had an antalgic gait, no weakness, and
normal muscle strength and tone.  He had tenderness on palpation in the
left paraspinal area.  He had full range of motion with pain on flexion and
extension of the lumbar spine, normal strength and negative straight leg
raising testing.  He was prescribed meloxicam and cold compresses on his
back.  Dr. Bitar recommended starting a walking program.  R. 717-18.

On November 15, 2016, Miller saw counselor Michael Goldberg,
LCPC.  He was highly agitated and did not like waiting in the waiting room
with others.  He spoke in an angry voice during much of the session and
exhibited anxiety and paranoia.  Miller ended the session early due to
agitation.  R. 562.

On November 18, 2016, Miller saw Dr. Michael Owolabi, M.D. for
chronic back pain.  The pain started 16 days earlier when he bent over to
pick up some socks.  He felt paralyzed and reported numbness in his leg.
He said he had numbness in his foot for six to seven years and had
difficulty getting out of bed.  Miller refused any injections or treatments.  He
also refused several physical examination modalities because of back pain.
R. 518, 560.  On examination, Miller had a steady gait, he had some
difficulty getting out of a chair, and he had some tenderness to palpation of
the lower back.  He was worried and very anxious during the examination.

R. 519, 561.  Dr. Owolabi assessed acute exacerbation of chronic low back pain.  Miller refused medications, injections, and referrals for physical therapy.  Dr. Owolabi ordered an x-ray and discussed stretching exercises with Miller.  R. 518, 560.  The x-ray showed a minor degenerative change, mild scoliosis convex to the right, and minimal marginal osteophytes. Miller's discs were preserved and there was no fracture.  R. 517, 563.

On January 3, 2017, Miller saw counselor Goldberg.  He reported new features with his anxiety of weakness, shakiness, and sleepiness.  He reported making a new contact through social media.  Goldberg assessed anxiety and panic disorder with agoraphobia and provided psychotherapy. R. 516.

On January 9, 2017, Miller saw state agency psychologist Dr. Steven Vincent, Ph.D., for a mental status assessment.  Dr. Vincent noted that Miller picked at the skin around his fingernails throughout the examination. He rocked back and forth during the examination, had difficulty sitting still, and was constantly fidgeting during the examination.  He complained of severe anxiety during the examination.  Miller's speech was poorly modulated, loud, rapid, and pressured.  He had difficulty staying focused and on-task during the examination.  His severe anxiety, distrust of others, and episodes of anger "was a predominant theme" of the examination.  R.

507.  Miller stated that he was poisoned by a cortisone shot in his back in

1991 and he had not been the same since.  He did not trust taking any

medication after that incident.  Dr. Vincent described Miller's preoccupation

with medication as destructive and almost delusional.  Dr. Vincent stated

that Miller appeared "quite volatile and explosive."  R. 508.  Miller reported

poor sleep, panic attacks, intrusive thoughts, flashbacks, and upsetting

dreams.  He said that he was emotionally numb and reported difficulty

concentrating.  Miller was oriented.  Dr. Vincent concluded that Miller had

the cognitive capacity to handle his own funds effectively.  R. 509-10.  Dr.

Vincent diagnostic impression was paranoia disorder with delusional

ideation prominent and problematic, panic disorder, agoraphobia, and

Cluster A personality traits.  R. 511.  Dr. Vincent concluded:

> SUMMARY AND CONCLUSIONS:
> Jeffrey presents with severe Panic Disorder with related
> agoraphobia and generalized anxiety with related episodes of
> depression, as noted above, as well as PTSD.  He was
> extremely overactive during the examination, agitated,
> irritability, pressure and push of speech, hyperactive as well as
> preoccupied with his anxiety to the point where he was
> constantly monitoring his pulse and constantly worrying about
> his functional abilities relative to being able to sit through the
> examinations secondary to severe anxiety.  He refuses
> medications which reaches delusional like proportions, feeling
> as though any kind of medication is an attempt to poison
> people.  He references a Cortisone injection as an incident in
> 1991 that change his life forever, which was an attempt at
> poisoning him.

R. 510.

On January 27, 2017, state agency psychologist Dr. Melanie Nichols, Ph.D., prepared a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment.  R. 178-79, 182-84.  Dr. Nichols opined that Miller had anxiety and obsessive-compulsive disorders and personality and impulse control disorders.  Dr. Nichols said that Miller's impairments caused a moderate limitation on his ability to understand, remember, and apply information; concentrate, persist, or maintain pace; and adapt or manage oneself.  Dr. Nichols said that Miller was markedly limited in his ability to interact with others.  R. 179.  He was moderately limited in his ability to understand, remember, and carry out detailed instructions; and to maintain attention and concentration for extended periods; work in coordination or proximity with others; accept instruction and respond appropriately to criticism from supervisors; and get along with coworkers. Dr. Nichols said Miller was markedly limited in his ability to deal with the general public.  R. 183.

Dr. Nichols recommended that Miller work in situations in which he had no contact with the public and limited contact with supervisors and coworkers.  Dr. Nichols noted that Miller lived independently and

maintained his activities of daily living.  He left the house, drove a car, and

shopped at Walmart.  R. 183. Dr. Nichols concluded:

> Overall, based on evidence currently available in the medical
> record regarding mental impairment, the claimant should be
> able to meet the basic mental demands of competitive,
> remunerative,  1-2 step tasks on a sustained basis, in settings
> of low social contact, including the abilities to understand,  carry
> out, and remember simple instructions; make judgments
> commensurate with the functions of simple work, i.e., simple
> work-related decisions; respond appropriately to supervision,
> coworkers and work situations; & deal with changes in a routine
> work setting if introduced gradually.

R. 184.

On January 30, 2017, Miller saw state agency physician Dr. Vittal

Chapa, M.D., for a consultative examination.  R. 536-40.  Miller reported

that he had three torn tendons and arthritis in his right shoulder.  He also

said that he had a herniated disc and scoliosis in his spine.  He reported

that in November 2016, he was in bed 26 days due to back pain.  He also

had a problem in the subtalar joint in his right foot and said he had a bone

spur in his right foot.  He had pain walking on his right foot.  R. 536.

On examination, Miller related well to Dr. Chapa.  His speech was

clear and understandable.  He walked with a limp, favoring his right foot.

Miller had no edema in his lower extremities, no motor weakness or muscle

atrophy, and he felt pinprick sensations in his extremities.  Miller had a

positive Tinel's sign in his right wrist, his reflexes were symmetric, he had

no paravertebral muscle spasms, and his grip strength was 5/5. He could perform gross and fine manipulations. Flexion of his lumbar spine was "subjectively limited." Straight leg testing was negative. R. 517. Miller had full range of motion in all joints except his right shoulder. R. 518.

On February 2, 2017, Miller went to a Memorial Express Care facility. He saw nurse practitioner Jennifer Frank, FNP-BC. R. 581-84. He reported right side abdominal pain with heavy lifting and low back pain. He had the abdominal pain for six days and researched abdominal pain on the Internet and became worried that he had a ruptured appendix. R. 582. On examination, Miller had normal range of motion and normal tone in his extremities. He walked into the examination room without difficulty. He had adequate flexion and extension in his spine, his spine was not tender to palpation, his strength was intact, and his sensation was intact in his lower extremities. Miller was cooperative and had an appropriate mood and affect. He was discharged when he was stable. R. 583.

On February 6, 2017, Miller went to the Memorial emergency room with abdominal pain. He saw Dr. Christopher Thomas, D.O. The pain had been going on for nine days and he was obsessed with the possibility that he had appendicitis. He had not been eating, but he had been drinking due to his anxiety. R. 585-86. On examination, Miller's abdomen was normal.

He had normal range of motion in his extremities, normal tone and strength, and no tenderness.  He was alert and oriented with no neurological deficits, with normal sensory, normal motor, and normal speech.  He was cooperative and had normal mood and affect.  A CT scan showed no acute abnormalities in his abdomen.  Dr. Thomas gave Miller Ativan and told him to stop drinking.  Miller felt better and was ambulating well and tolerated an oral diet.  He was discharged.  R. 587.

On February 15, 2017, Miller went to the emergency room at Memorial Medical Center in Springfield, Illinois.  He had "horrible anxiety symptoms."  R. 607.  He saw Dr. Matthew Johnston, M.D. and reported palpitations and chest tightness. On examination, he had normal range of motion with no tenderness.  He was cooperative, oriented, with no neurological deficits.  R. 608.  A chest x-ray showed no acute pulmonary process.  The radiologist noted mild degenerative changes in the thoracic spine.  R. 610.  Dr. Johnston gave Miller Ativan and he felt better.  Dr. Johnston noted, "I talked to him at length about going home with anxiety medicine.  I did not feel comfortable that as he drinks nearly daily.  He understood."  R. 610.  Dr. Johnston's impression was alcohol intoxication, atypical chest pain, and anxiety attack.  Dr. Johnston told Miller to follow up with Dr. Patel if the problem continued.  R. 611.

On February 16, 2017, state agency physician Dr. Charles Kenney, M.D. prepared a Physical Residual Functional Capacity Assessment.  R. 180-82.  Dr. Kenney opined that Miller could lift 50 pounds occasionally and 25 pounds frequently, stand and/or walk six hours in an eight-hour workday, sit for six hours in an eight-hour workday.  Miller was not otherwise physically limited.  R. 181.

On February 18, 2017, Miller went to Memorial Medical Center's Express Care facility for high blood pressure and headache.  R. 635.  He saw nurse practitioner Rhonda Woodbury, NP-BC.  Miller presented with anxiety.  The anxiety had escalated the night before and he needed to see his mother for "a hug and a long cry."  R. 636. On examination, Miller was cooperative with normal judgment.  His mood and affect were anxious with abnormal psychotic thoughts consisting of "Obsessive, flight of ideas."  Miller was not suicidal or homicidal, and he did not have delusions or hallucinations.  Woodbury assessed anxiety.  She told Miller to go to the emergency room for anxiety symptoms in the future.  Miller said he planned to go see his mother.  R. 637.

On March 17, 2017, Miller completed another Function Report – Adult form.  R. 370-77.   He spent his days in bed.  He got up to feed the cat, check his email, eat, and go to the bathroom, but otherwise he was in bed.

He took care of his cat and his personal care.  His back and shoulder pain sometimes interfered with his sleep and tying his shoes was hard.  He only bathed when "I really need to.  No need."  He shaved every three days.  R. 371.  Miller did not need reminders to take medications because he did not take medication, "Won't take meds. Poison!!"  He prepared simple meals that took 10 minutes.  He did laundry twice a month, and mowed his yard twice a month.  Mowing hurt his body, but his landlord insisted that he mow the yard.  R. 372.  Miller previously drove himself to shop twice a month for 15 minutes at a time.  He would "freak out and become aggressive in grocery lines & anybody near me. Feel threatened.  Adrenaline pumping. Heart pounding!!"  He paid his own bills and handled his own bank accounts.  R. 373.  Miller's hobbies were reading the Bible, watching television, and playing games on the computer until his back or arm hurt. He read the Bible daily for five hours and spent two hours on the computer. He watched television "all day long" and saw his best friend once every three months.  He did not go anywhere regularly except the grocery store. R. 374.  He avoided all social activity because he became panicky, anxious, and scared with others.  He became aggressive and abusive.  R. 375.

Miller said that his impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, use his hand, and get along with others. Miller said that he could lift 20 to 30 pounds. He could not stand or walk for long because his foot hurt. Bending hurt his back and reaching "hurt all." He could walk one-eighth of a mile and could pay attention until he got bored or offended. He could follow written instructions and could follow oral instructions unless the person giving the instructions disrespected him. R. 375. He did not get along with authority figures and was fired once because his boss disrespected him, and Miller "cussed him out bad." He could not stand stress. He said that, "I have to drink to stay calm." He did not tolerate changes in routine and said that he experienced "'derealization' and 'out of body' sensations. Terrifying!!!!" He used a cane and a brace. He needed his cane when he had pain in his foot. R. 376. His anxiety kept him alone out of the public and his foot limited how far he could walk or stand. His back locked up sometimes. When that happened, he had to lie on the floor or in bed "for weeks until healed." He could not sit in a chair for more than an hour, and he could not use a computer mouse for more than an hour because his shoulder went numb. R. 370.

On March 7, 2017, Miller saw Goldberg for counseling.  He apologized for abusive voice mail messages he had left for Goldberg. Goldberg told Miller that he could be banned from the clinic if further incidents occurred.  Goldberg assessed anxiety, panic disorder with agoraphobia.  R. 558.

On May 9, 2017, Miller saw Dr. Patel.  He complained of low back pain and said his back locked up with flexion.  His pain caused increased anxiety and he reported drinking alcohol to address his anxiety.  He was taking meloxicam and another NSAID for his back pain.  R. 552.  On examination, Miller had normal gait and station, normal range of motion, and normal strength and tone.  His mood was agitated.  R. 553.  Dr. Patel told Miller to take just the meloxicam and not any other NSAID medication with it.  Miller declined medication for anxiety.  R. 552.

On the same day May 9, 2017, Miller saw Goldberg.  He discussed problems his mother was having with a neighbor who was reportedly a drug dealer.  He also reported discussing and arguing over religion with others. Miller and Goldberg discussed options for dealing with his mother's problem such as calling the police or working with other neighbors.  R. 554.

On May 19, 2017, Miller went to the emergency room at Memorial with chest pains and dizziness.  He had the dizziness for five days and the

chest pain for one day. He saw Dr. Brad Farris, M.D. R. 659. On examination, Miller had normal strength, normal range of motion. His back was not tender and was oriented with no neurological deficits. He was cooperative and anxious. Miller's EKG, chest x-ray, and blood tests did not indicate any cardiac problems. He received an injection of Ativan and was discharged. R. 660.

On June 5, 2017, Miller saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination. R. 695-704. He reported pain in his right ankle and back pain and said his back locked up on him. He rated his pain at 8/10 and said he had spinal stenosis and a herniated disc. He had right shoulder pain and said that he tore three tendons in his right shoulder. R. 696. On examination, Miller walked with a limp, favoring his right foot. R. 697. Miller's motor strength in his upper extremities was 5/5. His motor strength in the left lower extremity was 5/5, and his right plantar flexion strength at the right ankle was 4/5. Pinprick sensation was intact and his grip strength was 5/5. Miller could perform fine and gross manipulations with both hands. His lumbosacral flexion was limited. Dr. Chapa found no evidence of paravertebral muscle spasms. Straight leg raising tests were negative to 75 degrees. He had full range of motions in all his joints except for the right ankle and right shoulder. R. 698. Dr. Chapa noted muscle

atrophy in the right calf muscle.  R. 699.  Miller was unable to toe walk, had

severe difficulty heel walking and squatting, and moderate difficulty tandem

walking.  He did not need an assistive device to walk.  R. 704.

On June 7, 2017, Miller saw state agency psychologist Dr. Michael

Trieger, Psy.D., for a psychological evaluation.  R. 705-08.  Miller was well

groomed and appropriately dressed.  He was cooperative but extremely

anxious and agitated.  He comprehended the questions asked and made

pressured rambling responses.  He made fleeting eye contact.  He said he

would not take medication because it was the work of the devil.  He

reported a history of panic attacks, agoraphobia and depression and said

that he responded to anxiety by becoming angry and confrontational.  He

admitted some homicidal and suicidal ideations.  He denied hallucinations

but believed people were following him and plotting against him.  In the

mental status exam, Miller was marginally cooperative but extremely

agitated.  He repeatedly checked his pulse, and his breathing was

exaggerated.  His mood was tense, mildly hostile, and extremely anxious.

His speech was clear, but his responses were disorganized, rambling, and

pressured.  He was oriented and his recent and remote memory were

intact.  His verbal reasoning skills were adequately developed and he was

generally attentive during the examination, but his internal thought

processes and agitation often drew him off topic.  Dr. Trieger concluded

that Miller would not need a third-party payee to handle disability benefits

he might receive.  Dr. Trieger concluded:

> <u>Summary</u>: Jeffrey Miller is a 50-year-old male referred by the
> Illinois Department of Human Services for evaluation of his
> mental status. Jeffrey presents with a reported history of panic
> disorder with agoraphobia, PTSD, bipolar disorder and
> delusional disorder, paranoid type. Mr. Miller participates in
> counseling but refuses to consider psychotropic medication
> because he believes it is the work of the Devil.  His clinical
> presentation was noteworthy for extreme anxiety, agitation,
> paranoid ideation, pressured/disorganized/rambling speech and
> frequent lapses in focus. He reports ongoing problems with
> paranoid delusions, derealization, depersonalization, auditory
> hallucinations, social isolation, extremely poor emotional
> regulation, occasional homicidal and suicidal ideation, and
> sleep and appetite disturbances.

R. 707. Dr. Trieger diagnosed Miller with panic disorder with agoraphobia,

bipolar disorder recurrent, and delusional disorder recurrent.  R. 708.

On June 14, 2017, state agency psychologist Dr. Russell Taylor,

Ph.D., prepared a Psychiatric Review Technique and Mental Residual

Functional Capacity Assessment.  R. 196-97, 200-02.  Dr. Taylor opined

that Miller had anxiety and obsessive-compulsive disorders and personality

and impulse-control disorders.  Dr. Taylor said Miller was moderately

limited in his ability to understand, remember, and apply information;

interact with others; concentrate, persist, or maintain pace; and adapt or

manage oneself.  R. 196.  Dr. Taylor opined that Miller was moderately

limited in his ability to:  understand, remember, and carry out detailed

instructions; maintain attention and concentration for extended periods;

work in coordination or in proximity of others; complete a normal workday

and workweek and maintain a consistent pace; get along with coworkers

and peers; and accept instructions and respond appropriately to

supervisors.  Dr. Taylor said Miller was markedly limited in his ability to

interact appropriately with the general public.  R. 200-01.

Dr. Taylor agreed with Dr. Nichols' opinion that Miller should work in

jobs that involved no contact with the general public and minimal contact

with coworkers and supervisors.  Dr. Taylor also noted that Miller lived

independently and was able to maintain activities of daily living.  Dr. Taylor

concluded:

> Overall, based on evidence currently available in the medical
> record regarding mental impairment, the claimant should be
> able to meet the basic mental demands of competitive,
> remunerative, 1-2 step tasks on a sustained basis, in settings of
> low social contact, including the abilities to understand, carry
> out, and remember simple instructions; make judgments
> commensurate with the functions of simple work, i.e., simple
> work-related decisions; respond appropriately to supervision,
> coworkers and work situations; & deal with changes in a routine
> work setting if introduced gradually.

R. 202.

On June 15, 2017, Miller saw Dr. Patel.  R. 1066-67.  He still had

high levels of anxiety, but had been able to calm himself down better.  He

had been doing yoga.  He decided not to go to the hospital anymore when he had panic attacks.  He had successfully calmed himself down during several episodes of panic attacks.  He also had dizziness for a couple of months.  He denied having chest pains and had no other complaints.  R. 1066.  On examination, Miller had normal gait and station, normal judgment and insight, and anxious mood and affect.  Dr. Patel assessed anxiety and dizziness and told Miller to continue his behaviors to calm himself and to abstain from alcohol as a treatment for anxiety.  Dr. Patel also suggested that Miller have his vision checked.  R. 1066.

On June 19, 2017, state agency physician Dr. Prasad Kareti, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 198-99.  Dr. Kareti opined that Miller could lift 50 pounds occasionally and 25 pounds frequently, stand and/or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday.  Dr. Kareti opined that Miller was not otherwise limited physically in his functional capacity.  R. 198-99.

On July 19, 2017, Miller saw Dr. Amit Sapra, M.D., for a follow up on lower back pain and anxiety.  He reported intermittent moderate low back pain.  He took Tylenol for his back pain and also had anxiety.  He wanted a medication he could take as needed.  He also reported off-and-on dizziness and generalized weakness.  R. 1064.  On examination, Miller had

normal gait and station, and had spasms in the paraspinal muscles. Dr. Sapra told Miller to take meloxicam for his back as needed, and prescribed hydroxyzine as needed for anxiety. R. 1065.

On September 13, 2017, Miller had x-rays of his right ankle. The x-rays showed no fracture and alignment within normal limits, no acute osseous abnormality, and degenerative changes in the talocalcaneal joint. R. 1063.

On October 14, 2017, Miller went to a Memorial Express Care facility for hypertension. He had hypertension for two days and said that he felt "like satan is attacking me and everyone is after me." He refused to take any medication. R. 905. On examination, Miller was oriented and alert with no focal neurological deficits. He was cooperative and non-suicidal. Once his condition was stable, he was discharged to home. R. 907.

On October 16, 2017, Miller saw Dr. Sapra for a follow up on his anxiety. He was very uncomfortable in crowded places and with lots of people. He believes he has every side effect of any medication he takes. He said lorazepam (Ativan) was the only medication that worked in the past. In the past, he took lorazepam once a month when he anticipated being in a situation that would induce anxiety. Dr. Sapra prescribed seven

lorazepam tablets, .5 mg each, to be taken as needed but not more than once a month.  R. 1059.

On December 17, 2017, Miller went to a Memorial express care facility.  He saw nurse practitioner LaToya Bond, FNP-BC complaining of chest pain and indigestion.  The symptoms started the day before and he had been disoriented and dizzy.  He had problems with vertigo in the past. On examination, Miller had normal heart rate and rhythm, with no murmur, and no edema.  His lungs were clear and he had normal strength, sensation, gait, coordination, and speech.  A Romberg test was negative. Miller was cooperative with normal mood and affect and his electrocardiogram was normal.  He had some fluid behind his ears.  Miller was stable and discharged home.  R. 882.

On December 27, 2017, Miller went to the Memorial emergency room.  He saw Dr. David Berg, D.O.  He had extreme anxiety for three days and constant chest pressure.  R. 817.  On examination, Miller had no swelling or tenderness, he had normal strength, he was oriented with no neurological deficits, and he was cooperative with an appropriate mood and affect.  He was anxious with pressured speech.  R. 818.  His chest x-ray was normal.  Dr. Berg prescribed 10 Ativan tables and discharged Miller to home.  R. 820.

On January 22, 2018, Miller had x-rays of his lumbar spine.  The x-rays showed no acute osseous abnormalities and mild scoliosis and spondylosis.  R. 806.

On February 5, 2018, Miller saw Dr. Sapra for a follow up on chronic lumbar back pain.  The pain was moderate and increased with heavy lifting and bending forward.  Miller reported some numbness and tingling in the lower extremities.  R. 1054.  On examination, Miller had paraspinal muscle spasms.  R. 1055.  Dr. Sapra suggested a referral to an orthopedic surgeon.  Miller refused and also refused any new pain medications.  R. 1054.

On February 21, 2018, Miller went to a Memorial Express Care facility with chest pain and anxiety.   This episode was triggered by the death of a friend and he had not been eating for days.  He denied any shortness of breath or radiating pain.  His anxiety symptoms were moderate.  R. 785.  On examination, Miller's heart was normal, his EKG was normal, he was oriented with normal speech and coordination and he was cooperative and had normal judgment.  His mood was anxious and tearful at times.  He was discharged when he was stable. R. 786.

On March 27, 2018, Miller saw Dr. Sapra for low back pain.  The pain radiated down his lower extremities and he had some numbness and

tingling in his toes.  He had some muscle relaxants at home but had not taken them.  R. 1048.  On examination, he had paraspinal muscle spasms. R. 1049.  Miller agreed to take the muscle relaxant Flexeril.  He refused a referral to either a specialist or physical therapy.  R. 1049.

On June 12, 2018, Miller saw physician's assistant, Tara Jain, PA-C, for chronic low back and right ankle pain.  His back pain started in 1991. The pain was constant and shot down his left leg to his toes.  He rated his current pain at 8/10 and worst pain at 10/10.  He had numbness and tingling all the time and had intermittent saddle paresthesia.  He denied any weakness in his legs.  He said that he had his ankle pain for eight years. He had pain and intermittent swelling and the pain was worse with prolonged standing, walking, and running.  No other joints were involved. R. 1101.  On examination, his mood and affect were normal, he had no edema, sensation was intact, and his gait was unremarkable.  Miller had tenderness in the lower lumbar area and tenderness over the paraspinal muscles.  Straight leg raising was positive on the left.  He had mild swelling in the ankle mortise, and tenderness to palpation in the ankle and foot.  He had normal strength in the ankle and no instability.  R. 1102.  Jain ordered MRIs of the foot and lumbar spine.  Miller declined physical therapy.  Jain

recommended continuing the meloxicam, rest, and alternating heat and ice. R. 1102.

On June 20, 2018, Miller had an MRI of his lumbar spine.  The MRI showed mild degenerative disc disease with facet hypertrophy, a small protrusion and mild canal stenosis at L4-L5, but no high-grade stenosis at any level.  R. 1085-86.

On June 21, 2018, Miller saw Dr. Sapra for low back pain.  He reported that the pain radiated down both lower extremities and was moderate.  The pain was worse with heavy lifting and bending forward.  He did not want to take any medication stronger than meloxicam.  On examination, Miller had paraspinal muscle spasms.  R. 1044-45.

On July 11, 2018, Miller saw psychiatrist Dr. Philip Pan, M.D. for a consultation.  He reported anxiety, panic attacks, and nightmares and intrusive thoughts.  He felt that he lost control when he left his house.  He felt like he was at constant war with "Satan and his cronies" and like Job in the Bible.  He worried about cars driving around in front of his house.  He felt spiritual warfare was real and he did not want to be "zombified" from meds.  He lay in bed all day, his appetite was low, and he worried about his mom's health because she took care of him.  He did not have anyone else. R. 1042.  He took lorazepam, one-half tablet as needed, approximately

every four weeks.  He would continue taking the lorazepam but would not consider any other medication.  R. 1041.  Miller drank alcohol about once every two months, but he used to drink more.  He stayed sober to care for his mother.  At times, he drank a shot of Bacardi to manage anxiety.  R. 1042.  Dr. Pan found that Miller's mood was a 3 on a scale of 0 to 10, with 0 being suicidal, 5 being neutral, and 10 being manic.  R. 1043.  Dr. Pan assessed PTSD, panic disorder with agoraphobia, generalized anxiety disorder, major depression recurrent, and alcohol abuse in sustained remission.  Dr. Pan continued the prescription for lorazepam.  R. 1041.

On July 12, 2018, Miller saw a physical therapist for evaluation of his back and ankle.  He reported pain that radiated down both legs to his toes. The pain was constant, tingling, and dull.  He rated his pain at 8/10 with the worst at 10/10 and said he had numbness and tingling all the time.  He had constant right ankle pain, which was worse with prolonged standing, walking, or running.  On examination, Miller's mood and affect was normal, his gait was unremarkable, and he did not use an assistive device.  Miller had tenderness over the lower lumbar spinous process and the lumbar paraspinal muscles.  He had increased pain with flexion, extension, and side to side motion of the lumbar spine.  He had positive straight leg test on the left, his sensation was intact, and he had mild swelling over the right

ankle with tenderness to palpation.   The therapist assessed chronic lower back pain with recent worsening left side radiculopathy, and chronic right ankle pain status post injury 2010.  Miller declined physical therapy.  The therapist recommended alternating heat and cold on Miller's back and to continue taking his meloxicam prescription.  The therapist recommended an MRI of the right ankle and possible referral to a surgeon.  R. 1102.

On July 23, 2018, Miller saw Dr. Sapra for a follow-up on his low back pain.  Dr. Sapra described Miller as "very pleasant" and noted that Miller had a history of significant anxiety.  Dr. Sapra noted that Dr. Pan recently provided a psychiatric consultation on Miller and that Dr. Pan diagnosed Miller with panic disorder and PTSD.  Dr. Sapra noted that Miller did not want to take any other medication besides lorazepam and took lorazepam only rarely.  Miller also would only take meloxicam for his back pain.  R. 1075.  On examination, Miller had paraspinal muscle spasms over the lumbar spine.  R. 1076.  Dr. Sapra offered him gabapentin or muscle relaxants to treat his back pain, but he refused.  Dr. Sapra refilled the prescription for meloxicam.  R. 1075.

On July 24, 2018, Miller saw podiatrist Dr. Robert Parker DPM.  He had normal muscle strength and tone, and he had +2/4 reflexes and no tremor in all extremities.  Miller had an "nonantalgic and well coordinated"

gait.  The examination of the ankle was normal except for significant pain on palpation of the anterior and lateral aspects of the right ankle. Dr. Parker also noted "notable inflammation."  R. 1089-90.  X-rays showed no acute fracture or dislocation, a sequela of an old calcaneal fracture with mild hindfoot volume loss and subtalar joint space loss.  Other joint spaces were maintained.  The radiologist concluded that the x-rays showed no acute findings.  R. 1090.  Miller refused to consider injections or surgery.  He agreed to try physical therapy and Dr. Parker made the referral to physical therapy.  R. 1089.

On August 2, 2018, Dr. Sapra completed the Mental Impairment Questions on a Medical Source Statement form.  R. 1033-36.  Dr. Sapra opined that Miller's mental impairments caused a marked interference with maintaining concentration, persistence, and pace; initiating and completing tasks; ignoring and avoiding distractions; and sustaining ordinary routine and regular attendance.  R. 1033-34.  Dr. Sapra opined that if Miller performed simple tasks in a low-stress work environment for an eight-hour workday, his production would be 21 to 30 percent below average.  He opined that Miller would miss work three times a month or more due to severe anxiety and panic, and Miller would be late for work three times a month, or more.  He further opined that Miller was markedly limited in

understanding and following instructions and using reason and judgment to make work-related decisions.  R. 1034.  Dr. Sapra said that Miller was moderately limited in his ability to function independently.  Miller was markedly limited in his ability to work a full day without needing extra rest; distinguish between acceptable and unacceptable work performance; and regulate his emotions, control his behavior, and maintain his wellbeing in a work environment.  Dr. Sapra opined that Miller was markedly limited in his ability to keep his social interactions free of excessive irritability, argumentativeness, sensitivity, or suspicion.  Miller was moderately limited in his ability to ask simple questions or request help; maintain socially acceptable behavior; and respond appropriately to requests, criticism, suggestions, correction, and challenges.  He could not work in proximity with coworkers without distracting them and being distracted.  He could work with supervisors who provided simple instructions on non-detailed tasks with no more than four contacts with the supervisor each day.  R. 1035.  Miller could not work in a job that required contact with the general public.  R. 1036.  Dr. Sapra said that Miller had "extreme anxiety and distractibility, inability to sit at one place for more than a few minutes."  R. 1036.

## The Evidentiary Hearing

On August 14, 2018, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 44-127.  Miller appeared with his attorney.  Vocational expert Bob Hammond also appeared.  R. 46.  Miller testified first.  He lived alone in a mobile home and his mother paid his bills.  R. 51.  He worked from the time that he was 18 until 2011, when he was approximately 45 years old.  He could not work because of his back, foot, and shoulder pain.  He cried from the pain when he got out of bed.  R. 53.  He had trouble walking through his home due to arthritis and he could not walk an eighth of a mile from his mobile home to get his mail from his mailbox.  His foot swelled when he walked.  R. 53-54.  Miller had not gone to the emergency room lately for back pain or foot pain.  R. 54.  His pain had stayed the same over the last few years before the hearing.  R. 82.

Miller broke his ankle in 2008 and it became worse over time.  He had stabbing pain in his ankle and it swelled whenever he wore a shoe.  He wore shoes once a week, usually to go to the grocery store.  R. 79-80.  His ankle also swelled sometimes when he walked around his house without wearing a shoe.  Once his foot started swelling, he had to lie flat on his back and rest his foot.  Sometimes he also propped up his leg to take the pressure off his back.  The swelling lasted for the rest of the day.  R. 81-82.

Miller's back "locked up" in November 2016 or 2017.  He said, "I was in bed for 33 days.  I couldn't get out of bed.  My back locked up.  I missed Thanksgiving.  I lost like 26 pounds because there was nobody to take care of me and feed me, so I almost had to crawl to the bathroom."  R. 54.

Miller's shoulder got "sore, achy, arthritis, hard to lift."  The shoulder hurt when he slept on it and he could not lift his arm over his head.  His shoulder popped sometimes when he lifted it out to the side and the shoulder hurt when it popped.  He was supposed to go to physical therapy for his shoulder, but he walked out of the physical therapy location because there were too many people there.  He did not get the physical therapy. Miller said his shoulder did not heal correctly.  He refused to consider surgery on his shoulder.  R. 66-67.

Miller spent most of every day lying in bed because of his pain.  He did not experience pain when he was lying flat on his back.  R. 84-85.

Miller took meloxicam for the pain and had no side effects from the medication.   R. 54.  He had not had any injections in his back.  He had a cortisone shot in his spine in 1991 and he said that "messed me up."   He tried physical therapy, but the therapy did not provide any benefit.  R. 55.  A doctor made him do exercises for his back once and he could not get out of

bed for the next four or five days.  R. 94.  He did not wear a back brace and he did not have a TENS unit.  R. 55.

Miller used a cane at home.  No doctor prescribed it.  He used the cane because sometimes he could not put any weight on his injured foot and ankle.  He refused both cortisone injections and surgery on his ankle. R. 56.  He said that injections or surgery could make things worse.  He did not trust doctors and did not believe that they could help him.  R. 91-92.

Miller was hospitalized once for a mental condition "a long time ago." He said, "I talked my way out of it."  R. 56. At that time, he tried to commit suicide by cutting his wrist and, later, took an overdose of aspirin.  He was 22 or 23 years old.  R. 57.

The ALJ asked Miller, "I'm wondering what has gone on because you were able to work all those years and then now you're sitting here wigging out.  What's going on?"  R. 58-59.  Miller answered:

> Well, because the anxiety's got a lot worse because I couldn't pay my bills.  My mother's paying my bills, and if she dies, I'm going to be homeless, so the anxiety had toll – took off.  I sit in my house 24/7 for the last eight years with a cat . . .
> . . .
> I don't have no friends.  No friends come over.  I don't' see nobody. I'm in that house.  I'm a hermit, and I panic.  My mom's my best friend.

R. 59.

Miller had anxiety all the time when he was working.  The anxiety was not as bad then.  The anxiety has gotten worse as he has gotten older. Miller said his mother was dying and he was worried he will become homeless after she dies.  R. 60.  Mental health therapy sessions did not work.  R. 63.

The ALJ asked why Miller had no behavioral problems in many of his encounters with healthcare professionals and in other encounters he was "bordering on delusional behavior."  He had no explanation other than Satan was attacking him.  R. 60.  His worst episode occurred when he had panic attacks for 77 days straight.  He felt that Satan was attacking him and he read the Bible completely during this episode.  R. 69-73.

The last time Miller was last taken to the emergency room with panic attacks was four to six months before the hearing.  He said they gave him Ativan and sent him home.  His doctor gave him a prescription for Ativan him to take home.  R. 61-62.  He only gave Miller seven pills because Miller was afraid that he could become addicted.  R. 67.  Miller usually took a half a tablet at a time and he averaged taking 14 doses of Ativan per month (one-half pill each time).  He took Ativan when his blood pressure went up. R. 68.  He took a whole Ativan the day before the hearing.  He did not take

one the day of the hearing because the medicine would make him sleepy.
R. 62.

Miller went grocery shopping at 5:30 a.m. when no other customers
were there.  He did not like having anyone behind him in the checkout
lanes.  He did his own cooking, cleaning, and laundry.  R. 65.  Vacuuming
hurt his back.  He mowed his lawn, but the day after he mowed, his ankle
and back were very sore and painful.  He could not do anything the day
after he mowed the lawn.  R. 84, 103.  He took care of his personal
hygiene.  He cut his own hair because he could not afford to pay to have it
cut.  He only left his house to go to the grocery store and to medical
appointments.  R. 65.

Miller said that anxiety affected his ability to perform his regular
activities.  His chest got tight and he could not breathe. He could not do
anything.  He had anxiety attacks five to seven times a week.  R. 75. He
had to sit down or lie down when he experienced a panic attack.  He
started concentrating on calming down and took his Ativan.  If
concentrating and the Ativan did not work after five or six hours, he called
911 and firemen and paramedics came and took him to the hospital.  R.
102.

Miller got along with his mother sometimes. He did not get along with his brothers. His brothers were upset that his mother was spending all her money to support Miller. R. 65. Miller did not get along with people. He said that he had bad teeth, and so, did not smile. He said that people presumed he was in a bad mood and that made him angry. He often ended up in a fight because he got angry. He no longer went out to bars for this reason. R. 75-76. He also didn't like criticism and he avoided people so he did not hear much criticism anymore. R. 90.

Miller did not go to family functions or restaurants because he did not like to watch people eat and did not like people watching him eat. He compared eating to going to the restroom. R. 76-77.

Miller could usually concentrate and focus on television shows and remember what he watched. R. 96-97. He could focus and concentrate when he was not mad or angry. He rambled when he was angry and felt "very violent" when he was mad. He only acted out his violent feelings on himself. He yelled and vented when he was mad. R. 88. He had problems with racing thoughts "all the time" and had problems finishing what he started. He would start cooking or laundry and not finish the job. R. 88-89. He said he heard things that other people did not hear. The voices were associated with his belief that Satan was attacking him. R. 90-91.

Page **41** of **55**

Miller said that he could sit in a chair for an hour and a half at a time. After an hour and a half, he experienced pain down his left leg. R. 77-78. He could stand for an hour and a half to two hours at a time. R. 78. If he stood too long, his foot became swollen the next day. R. 79. He could lift a gallon of milk without difficulty and he could lift a case of soda up to a counter sometimes. R. 95. He could hold weight if he was standing. He had pain if he bent over while carrying weight. Stooping increased his back pain, but crawling did not increase his pain. Twisting from side to side hurt. R. 83. Doing any work "where my lower back muscles are supporting my whole upper half kills me." R. 95.

Miller was right-handed and he said that sometimes his entire right arm went numb. His arm went numb five to seven times a month and the numbness lasted for hours. R. 108. He said they tried to do a nerve conduction study on his arm, but he left after the person doing the study shocked him. He left and did not complete the study. R. 106.

Miller said he could not work a job where he could sit or stand as needed, he did not need to deal with the public, and he worked with only three or four coworkers around him. He said that he would leave when he got an anxiety attack. He could not work on Ativan because, "It zones me."

R. 98-99.  He also said that if he sat or stood for eight hours, he would not be able to walk the next day.  R. 102-03.

Vocational expert Hammond testified.  Miller had no objections to Hammond's qualifications as an expert.  R. 114.  The ALJ asked Hammond the following hypothetical question:

> At this time then, I would like you to consider a hypothetical individual of the same age, education and having the same past work as this Claimant limited to a range of medium work with occasional climbing ladders, ropes and scaffolds; occasional stooping, crouching, crawling and balancing; limited to frequent but not constant reaching overhead with the right arm; limited to simple, routine, repetitive tasks; occasional interaction with coworkers and supervisors of a brief and superficial nature; no interaction with the public .
> He requires a stand-alone work station. He can tolerate no more than occasional changes in work processes and procedures, and he cannot perform fast-paced work. Production must be measured daily and not on an hourly basis. Is there any past work he could perform?

R. 114-15.  Hammond opined that the person could not perform Miller's past relevant work as a carpet cleaner and flooring installer.  Hammond said that such a person could perform other jobs in the national economy, including, cleaner, with 136,000 such in the national economy; light level press operator, with 127,000 such jobs in the national economy; and injection molder, with 121,000 such jobs in the national economy; sorter, with 89,000 such jobs in the national economy.  R. 115-16.   The hearing concluded.

## THE DECISION OF THE ALJ

On October 10, 2018, the ALJ issued her decision.  R. 25-37.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC,

Page **44** of **55**

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden at Step 5 to present evidence that,

considering the listed factors, the claimant can perform some type of

gainful employment that exists in the national economy.  20 C.F.R. §§

404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir.

2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Miller met his burden at Steps 1 and 2.  He had

not worked since he filed his SSI application on September 22, 2016, and

he suffered from the severe impairments of degenerative arthritis of the

spine, degenerative joint disease of the right shoulder, osteoarthritis of the

right ankle, affective disorder, anxiety and panic disorder, personality

disorder and alcohol abuse.  R. 27.  The ALJ found at Step 3 that Miller's

impairments or combination of impairments did not meet or equal a Listing.

R. 28.

At Step 4, the ALJ determined that Miller had the following RFC:

4.    After careful consideration of the entire record, the
undersigned finds that the claimant has the residual functional
capacity to perform medium work as defined in 20 CFR
416.967(c) except he can no more than occasionally stoop,
crouch, crawl, and balance. He can frequently, but not
constantly, reach overhead with the right arm. He is limited to

jobs that entail only simple, routine and repetitive tasks, with no more than occasional changes in work processes and procedures.  He cannot perform fast-paced work and requires work in which production is measured on a daily and not hourly basis.  He is limited to occasional interaction with coworkers and supervisors of a brief and superficial nature, and requires a stand-alone workstation.  He can tolerate no interaction with the public.

R. 28.  The ALJ relied on Dr. Chapa's examinations that showed normal strength in one examination and a slight reduction in strength in the other. The ALJ relied on the examination notes from various providers that showed normal range of motion, normal gait and station, and normal strength.  The ALJ also relied on the opinions of Drs. Kenny and Kareti that Miller could perform medium work.  The ALJ found that the records of Miller's mental health were inconsistent.  The ALJ noted that Miller said that lorazepam worked on his anxiety, but he refused to take it.  The ALJ also noted that many examinations found that he was cooperative and had normal judgment.  The ALJ noted that Miller helped his mother with problems, he lived independently, and he established relationships over social media.  The ALJ relied on psychologists Drs. Vincent and Trieger's assessment that he could handle his personal financial accounts.  The ALJ also relied on the opinions of psychologists Drs. Nichols and Taylor that Miller could perform unskilled work that was routine and had limited interaction with coworkers and supervisors.  R. 29-34.

The ALJ gave little weight to Dr. Sapra's opinions in the August 2, 2018 Medical Source Statement.  R. 34-35.  The ALJ said that Dr. Sapra's opinions were "similar to an outright assessment that one is disabled," and "are limited to the purview of the Commissioner, and cannot be delegated." R. 34.  The ALJ also noted that Dr. Sapra was a general practitioner and not a psychiatrist.  The ALJ found that Dr. Sapra did not give medical findings to support his opinions and noted that Dr. Sapra stated that Miller was "a very pleasant individual who despite his psychiatric problems chose to take Lorazepam only rarely.  In that examination, the doctor did not even conduct a mental status examination."  The ALJ concluded that "Dr. Sapra's own examination records do not support his opinion, and it is given no weight herein."  R. 35.

The ALJ discounted Miller's statements regarding his symptoms which were inconsistent with other evidence in the record.  The ALJ found that his statements were inconsistent with medical examinations that showed normal strength, normal range of motion, a normal or steady gait, and stable joints.  The ALJ found the statements were also inconsistent with Miller's refusal to take recommended medical treatments including medication and surgery.  The ALJ noted at the first examination that Miller's range of motion in his spine was subjectively limited and Miller's claims of

debilitating pain was inconsistent with the fact that he did not take strong pain killing medications and he has not completed courses of physical therapy, has not seen a pain specialist, and has not used a TENS unit. Also, the record did not show abnormal weight loss or muscle atrophy.  The ALJ also said that Miller's daily activities as stated in the two Function Reports was inconsistent with his statements at the hearing that his physical symptoms precluded work.  Miller lived independently, took care of himself, cooked his own meals, cleaned, vacuumed, mowed the lawn, did laundry, and shopped for groceries.  The ALJ noted that Miller cut his own hair, which required raising his arms above his head.  R. 30-31.

The ALJ found that Miller's statements about the debilitating nature of the symptoms of his mental impairments was not consistent with the record.  The ALJ found that lorazepam effectively treated his anxiety, but Miller refused to take the medication.  The ALJ noted that counselor Goldberg found that Miller developed skills to deal with his anxiety. Goldberg also was able to establish a rapport with Miller and Miller was able to establish new relationships with others over social media.  The ALJ noted that Miller was able to assist his mother and help take care of her. He also told Dr. Patel that he was also able to calm himself during panic attacks and did not need to go to the emergency room.  The ALJ also cited

treatment notes in which Miller was cooperative and had normal judgment, mood, and affect.  R. 32-33.

The ALJ determined at Step 4 that Miller could not perform his prior work as a carpet cleaner and flooring installer.  At Step 5, the ALJ determined that Miller could perform a significant number of jobs that existed in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 4040 Subpart P Appendix 2, and the testimony of vocational expert Hammond, that a person with Miller's age, education, work experience, and RFC could perform the representative jobs of laundry worker, cleaner, press operator, injection molder, and sorter.  R. 35-36. The ALJ concluded that Miller was not disabled.  R. 37.

Miller appealed the ALJ's decision.  On August 15, 2019, the Appeals Council denied Miller's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Miller then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally her analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to her conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

After careful consideration, the Court concludes that the ALJ erred in her evaluation of the opinions of Miller's treating physician Dr. Sapra. The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue,

532 F.3d 606, 608 (7th Cir. 2008).[2]  The ALJ acknowledged that Dr. Sapra

opined that Miller "had a marked limitation in concentration, persistence

and pace (CPP), in ability to understand, remember and apply, and in the

ability to adapt or manage himself in social functioning, the doctor opined

that the claimant was primarily moderately limited." R. 34 (internal citations

to the record omitted).  The ALJ gave no weight to Dr. Sapra's opinions for

four reasons: (1) Dr. Sapra's opinions were not medical opinions, but

administrative findings of disability reserved to the Commissioner; (2) Dr.

Sapra was not a specialist in psychiatry; (3) Dr. Sapra did not give medical

findings to support his opinions; and (4) Dr. Sapra's examination records

did not support his opinions.  R. 34-35.  The ALJ's first two reasons are

error.  The ALJ failed to minimally articulate her analysis of all the relevant

evidence to support the third and fourth reasons.

Dr. Sapra clearly rendered medical opinions on the effects of Miller's

mental impairments on his ability to function and did not opine on the

ultimate issue of disability.  The Commissioner has identified the relevant

areas to evaluating a mental impairment's effect on a person's ability to

---

[2] The Commissioner amended the regulations regarding the interpretations of medical evidence.  The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

function:  Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  20 C.F.R. 416.920a(c)(3).  The Commissioner has furthermore defined the relevant scale to apply to determine the functional effect of the impairments:  none, mild, moderate, marked, and extreme.  20 C.F.R. § 416.920a(c)(4).  State agency psychologists Drs. Nichols and Taylor opined on these same functional categories and rendered opinions using the same scale.  Such opinions are medical opinions on functional limitations due to mental impairments.  See 20 C.F.R. § 416.913(a)(2)(i)(B).  Dr. Sapra expressed medical opinions on Miller's functional limitations.  Dr. Sapra found marked limitations in several areas using the same scale used by Drs. Nichols and Taylor.  Dr. Sapra did not make or attempt to make administrative findings on the ultimate issue of disability.  The ALJ erred in so finding.

The ALJ also erred in dismissing Dr. Sapra's opinion because he was not a psychiatrist.  Dr. Sapra was a licensed physician.  As such, he was an acceptable medical source qualified to render the medical opinions, including opinions on Miller's functional limitations due to Miller's mental impairments.  29 C.F.R. §§ 416.902(a)(1), 416.913(a)(2)(i)(B).  The regulations did not require a treating physician to be a specialist before his

opinions were entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2).

The ALJ erred in superimposing that requirement on the regulation.[3]  The

ALJ erred in dismissing Dr. Sapra's opinions completely because he was a

doctor, but not a psychiatrist.

The ALJ next said that Dr. Sapra did not give any medical findings to

support his opinions. R. 34-35. The Court disagrees. Dr. Sapra identified

Miller's conditions that supported his opinions as "PTSD, panic disorder

with agoraphobia, generalized anxiety disorder, major depression." R.

1036. Dr. Sapra further gave the following objective signs and symptoms

that Miller displayed on which Dr. Sapra based his decision as, "extreme

anxiety and distractibility, inability to sit at one place for more than a few

minutes." R. 1036. These stated bases may or may not be sufficient to

support Dr. Sapra's opinions, but that is for the ALJ to determine. The ALJ,

however, did not analyze this evidence. The ALJ, therefore, failed to

minimally articulate her analysis of the material evidence.

Finally, the ALJ failed to minimally articulate her analysis of Dr.

Sapra's examination records of Miller. The ALJ stated that Dr. Sapra's

---

[3] The ALJ also relied on the ability of non-psychiatrist physicians, such as emergency room physicians, to judge Miller's mental status. See R. 33 ("At his ER and prompt care visits, even when anxiety was considered, the claimant's MSEs during treatment indicated normal functioning; he was cooperative, with normal judgment mood and affect."). Those doctors were qualified to opine on Miller's mental health condition and so was Dr. Sapra.

examination records did not support his opinion.  The ALJ based this

conclusion on "Dr. Sapra's most recent examination notes."  R. 35.  The

ALJ stated,

> [D]r. Sapra's most recent examination notes . . . described the
> claimant as a very pleasant individual, who despite his
> psychiatric problems chose to take Lorazepam only rarely.  In
> that examination, the doctor did not even conduct a mental
> status examination.  Thus, Dr. Sapra's own examination
> records do not support his opinion, and it is given no weight
> herein.

R. 35.  The ALJ did not give a citation to the record, but it appears the ALJ

was referring to Miller's office visit to Dr. Sapra on July 23, 2018.  R. 1075-

76.   Miller came to Dr. Sapra that day because of low back pain.  The fact

that Dr. Sapra did not examine Miller's mental status when Miller was there

for back pain would not be surprising.  The ALJ's quoted comment does not

show that she considered Dr. Sapra's other numerous examination notes in

the record.  Those notes may or may not support Dr. Sapra's opinions.

The Court cannot tell because the ALJ did not minimally articulate her

analysis of those records.  The ALJ also did not mention whether Dr.

Sapra's opinions were supported by other medical evidence in the record.

Dr. Sapra was Miller's treating physician.  His opinions may or may

not be entitled to controlling weight.  The Court cannot tell because the ALJ

failed to analyze Dr. Sapra's opinions properly and failed to minimally

articulate her analysis of the material evidence relevant to those opinions. This failure should require a remand.

THEREFORE, THIS COURT RECOMMENDS that Plaintiff Jeffrey Miller's Motion for Summary Reversal (d/e 11) should be ALLOWED, the Defendant Commissioner's Motion for Summary Affirmance (d/e 17) should be DENIED, and the decision of the Defendant Commissioner should be REVERSED and REMANDED for further proceedings.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   November 30, 2020

_____s/ Tom Schanzle-Haskins_____

TOM SCHANZLE-HASKINS

UNITED STATES MAGISTRATE JUDGE